# 14-2640

## In the
## United States Court of Appeals
### For the Second Circuit

CHESTER HORN, Individually, and as Administrator of the
Estate of David Horn, GLADYS HORN, DAVID HORN, JR.,
DIANA HORN and PATRICIA HORN,

*Plaintiffs-Appellants,*

v.

CITY OF YONKERS POLICE OFFICER DEAN POLITOPOULOS,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFFS-APPELLANTS

WILLIAM A. THOMAS, ESQ.
*Attorney for Plaintiffs-Appellants*
89 5th Avenue, Suite 900
New York, New York 10003
(212) 741-8900

# <u>TABLE OF CONTENTS</u>

**Pages**

<u>PRELIMINARY STATEMENT</u> .................................................... 1

<u>JURISDICTION</u> ............................................................... 3

<u>ISSUE PRESENTED</u> ........................................................ 3

<u>STATEMENT OF CASE</u> .................................................... 3

<u>SUMMARY OF ARGUMENT</u> ................................................ 13

<u>ARGUMENT</u>

    THE RECORD AMPLY SUPPORTED APPELLANT'S
    CLAIM THAT APPELLEE, AND PERSONS WITH
    WHOM HE WAS UNITED IN INTEREST,
    FRAUDULENTLY CONCEALED THE FACT OF
    HIS SHOOTING ............................................................... 14

<u>CONCLUSION</u> ............................................................... 18

# TABLE OF AUTHORITIES

**Pages**

**Cases:**

Abbas v. Dixon,
    480 F.3d 636 (2d Cir. 2007) ................................................... 2

Bell v. Milwaukee,
    746 F.2d 1205 (7th Cir.1984) ............................................. 16

Dory v. T. Ryan,
    999 F.2d 679 (2d Cir. 1993) ............................................... 15

Horn v. O'Brien et al.,
    07 Civ. 7822 (SHS). ............................................................ 1

Keating v. Carey,
    706 F.2d 377 (2d Cir.1983) ................................................ 15

Paige v. Police Department of Schenectady,
    264 F.3d 197 (2d Cir.2001) ............................................ 15-16

Pearl v. City of Long Branch,
    296 F.3d 76 (2d Cir. 2002) ........................................... 14, 16

Pinaud v. County of Suffolk,
    52 F.3d 1139 (2d Cir.1 995) .............................................. 14

**Rules, Laws & Statutes:**

28 U.S.C. § 1291 .................................................................... 3

42 U.S.C. §1983 ..................................................................... 1

New York General Municipal Law 50-h ....................................... 4

# PRELIMINARY STATEMENT

Plaintiff-appellant respectfully submits this brief in support of his appeal from the judgment (A308) of the district court for the Southern District of New York (Sidney H. Stein, J.) dated June 23, 2014, which dismissed the action after granting summary judgment to defendant-appellee in an order dated June 20, 2014 (A307), for reasons stated in a decision read into the record on June 20, 2014 (A278-306). In this action seeking damages for loss of life under 42 U.S.C. §1983, plaintiff appeals from so much of the decision as determined that the action was time-barred, and submits that the district court improperly determined that plaintiff-appellant had failed, as a matter of law, to demonstrate fraudulent concealment of facts indicating that defendant-appellee had fired his service pistol at appellant's unarmed decedent, which concealment would warrant application of equitable estoppel tolling the statute of limitations.

Appellant contended below that the record in this matter, and the record and in an earlier-commenced suit[1] against five other law-enforcement personnel—three Yonkers police officers and two New York state troopers—who admit to shooting at plaintiff's decedent, overwhelmingly manifested concealment by appellee and persons with whom he was united in interest, i.e., his employer, Yonkers Police Department (YPD), of his participation in the same shooting. YPD and its counsel-

_____

[1] Horn v. O'Brien et al., 07 Civ. 7822 (SHS).

-the same attorneys representing the officers sued in the related action as well as appellee in the proceedings below--have consistently and affirmatively represented to appellant and the decedent's family that only three Yonkers officers fired their weapons in the course of the March 19, 2005, event that forms the basis of this action and of the related litigation. In clear reliance on those representations by YPD and its counsel--which continue to the present time, and which constitute appellee's express position in this litigation--plaintiff in 2007 commenced the related action against the officers identified as shooters, and by extension declined to commence it against anyone else. The district court's finding that appellant was not "induced by fraud, misrepresentations or deception to refrain from filing a timely action," as required by Abbas v. Dixon, 480 F.3d 636, 642 (2d Cir. 2007), was therefore clearly erroneous. Appellant argued to the court below that, in view of subsequent revelations, this fact--i.e., knowing and continuing misstatements by YPD concerning who fired--was fraudulent concealment, particularly in the absence of any extrinsic evidence that would, could or should have alerted plaintiff to the possibility of additional shooters beyond the ballistics report produced by counsel on the eve of the running of the statute of limitations.

## JURISDICTION

This Court has subject matter and appellate jurisdiction pursuant to 28 U.S.C. § 1291, as the order appealed from dismissed the action and thus constituted a final decision of a district court.

## ISSUE PRESENTED

Did the district court err in concluding that plaintiff-appellant, in opposing defendant-appellee's summary judgment motion, had failed to present evidence of fraudulent concealment that would have equitably estopped appellee from relying on the statute of limitations?

## STATEMENT OF THE CASE

As set forth above, this action arises from the shooting death of plaintiff's decedent, David Horn, a 37-year old father of two, near his father's residence on Alexander Street, Yonkers, in the early hours of March 19, 2005. It is wholly conceded that Horn was unarmed; it is likewise conceded that at least five officers fired at least twenty-eight shots, six of which entered Horn's body after penetrating the sport utility vehicle in which he had been driving before concededly bring it to a full stop. Also as noted, of the five law enforcement personnel who admit to firing, three were officers of Yonkers Police Department and two were New York State Police troopers.

The events leading to the shooting are disputed. It is undisputed that Horn at some point resumed movement of his SUV after bringing it to a stop on Alexander Street; however, whether he did so before or after officers began firing at him is disputed. Pertinent, however, to the instant appeal is that YPD from the outset has taken the official position, speaking through its attorneys (Yonkers Corporation Counsel), that only three YPD officers, rather than four, fired.

The Horn family retained Michael P. Barnes, Esq., in late 2005, to pursue a possible claim arising from the death. Before commencing the related action, Mr. Barnes, on appellant's behalf, obtained letters of administration from the Surrogate's Court, Bronx County, and thereafter went through the notice-of-claim and hearing process mandated by New York's General Municipal Law 50-h. He then commenced the related action (Complaint, A12) in September, 2007, substantially completing service of the defendants by the end of 2007. After answering by counsel, the YPD defendants in the related action produced the disclosures set forth at A25-187 on or about March 8, 2008, i.e., with eleven days remaining on the applicable three-year statute of limitations. Though not noted by the court in its decision below, appellant's counsel, Mr. Barnes, died unexpectedly within five months thereafter, and was not succeeded by any attorney in the related action until 2009. Incoming counsel immediately noted the ballistics report implicating Politopoulos as set forth below, took or defended a total of nineteen

depositions in 2009 and, finding appellee's sworn explanation for the ballistics results as unconvincing as the other officers' denials of recollection that they saw Politopoulos at the scene of the incident, sought in early 2010 to amend the complaint in the related action to include appellee as a defendant in that action. After Magistrate Judge Yanthis denied appellant's request to so move (A19-24), appellant commenced the within action separately in early 2011 (Complaint, A8).

The ballistics finding:

Defendant conceded below, and the district court noted (A281-82), that Politopoulos's pistol tested positive for discharge. The ballistics report and related forms (A165-85) require extensive cross-referencing to divine who may have fired and how many times each shooter did so: i.e., nowhere does it simply identify the number of shell casings recovered for each shooter or state whether a given officer's pistol tested positive for discharge. Rather, lists of pistols with various serial numbers are given (A165) and "item numbers" are assigned to each; subsequent pages address forensic aspects of the item-numbered pistols. The YPD evidence voucher identifies the owners of the nine pistols submitted by the Yonkers department for testing following the incident. Politopoulos's gun is identified as "item 7" (A167). It was found to have "evidence of discharge present in barrel" (A176), a finding otherwise made only in connection with the weapons submitted by those Yonkers officers and State troopers who admit to firing, i.e., the

5

five defendants in the related action.   In short, six, not five, of the eleven police pistols submitted for examination tested positive for discharge in the aftermath of the Horn shooting, and the report makes no forensic distinction among those six weapons; their conditions are identically characterized.

The "investigation":

As noted, it should largely suffice to observe--as indeed the district court did--that the entirety of the documents produced by Yonkers Police Department (A25-187), are nearly devoid of discussion of the ballistics results generally, even if they include the ballistics report itself, and are wholly barren of discussion of the number of pistols found to have had evidence of discharge in their barrels as well as of even passing consideration of the possibility that Politopolous fired, let alone investigation into why his gun tested positive or any effort to rule out the possibility that he fired.  Indeed, they are largely devoid of reference to Politopoulos at all.  Telling in the first instance is the final memorandum submitted by the head of Internal Affairs to the Police Commissioner, dated November 15, 2005 (A36), which, before recommending exoneration of Craft, Pilot and Wissner, states that "[f]rom our investigation three Yonkers Police Officers fired their Glocks," and lacks any discussion of the ballistics analysis whatsoever.

Similarly, and ultimately more revealingly, the next document in the Yonkers production, i.e., the final Internal Affairs investigative report dated October 31, 2005 and signed by Detective Sergeant Kevin Murphy (A38-53) notes the ballistics tests generally and the fact the Politopoulos was among those officers whose pistols were submitted for analysis (id. at 13), but completely declines to note the discharge findings, and concludes that "[a]nalysis of the cartridge cases and the eleven weapons submitted for testing showed that the Troopers, Detective Craft and Police Officers Pilot and Wissner discharged their firearms." It is unclear whose "analysis" he means, but the ballistics report itself contains nothing in the way of a conclusion that those five pistols were fired but the sixth wasn't. Moreover, nothing in the ballistics report or any other document--including Yonkers's own documents--states or even insinuates that the lack of recovered cartridge cases from the crime scene would be forensically dispositive of whether, or how many, shots were fired by a given weapon, especially when a gun is found to have tested positive for discharge, for the obvious reason that it is not remotely dispositive; notably in this case, as the same report acknowledges two page earlier, Trooper O'Brien was determined to have shot seven times, even though only six shell casings matching his gun were recovered and submitted to the lab.[2]

---

[2] Notably, O'Brien consistently maintained in his internal statements and testimony that he only fired four shots, further undermining the idea that the presence or absence of recovered shell casings would be determinative of whether a gun was fired.

The absence from Murphy's report of any reference to an investigation into the possibility that Politopoulos fired is also remarkable since Politopoulos himself testified to having been interviewed about it by Murphy:

> Q. Now, you mentioned a ballistics report and being shown a ballistics report or what you think may have been, correct?
> MR. LEVINSON: Objection to form.
> A. Possible ballistics report. I'm not --
> Q. Do you recall who showed it to you?
> A. I believe and again I could be wrong, it was Sergeant Murphy of Internal Affairs.
>
>        ***
> Q. And what do you recall Sergeant Murphy saying to you in this context?
> A. During the Internal Affairs investigation he inquired as to how come my firearm had tested as being recently fired at county lab and I explained to Sergeant Murphy, which I am going to explain to you later that I was at training several weeks prior to the incident that's why my weapon had tested dirty.
> Q. What did Sergeant Murphy say in response to that?
> A. I don't recall.
>
>        ***
> Q. Did Sergeant Murphy ever say anything to you about this again?
> A. No, I don't believe so.

Politopoulos deposition at 62-64, A190-92.

Wildly implausible on its face, appellee's I-must-not-have-cleaned-it alibi might have had a modicum of persuasive value in the event that someone with personal knowledge had submitted an affidavit corroborating his presence on the firing range or concerning the cleaning procedures he supposedly failed to employ that day, though such an affidavit would at most have gone to the weight of the

evidence. As it happens, no such affidavit or corroborating testimony was offered, just as no investigation into Politopoulos's risible story was apparently ever conducted. Rather, in support of his motion appellee offered a perfunctory affidavit (A275) from a firing range sergeant (not previously identified by YPD) who stated that, according to his records, Politopoulos "qualified" for a range training course roughly a month before the Horn shooting, and that it "was his responsibility to clean his weapon." Assuming arguendo that "qualifying" was the same thing as "shooting," and further assuming that this would somehow amount to corroboration of Politopoulos's claim that he was on the firing range on the date in question and used the gun in question, the form in any case made a mockery of his already implausible claim: on it, he specifically initialed a box entitled "officer weapon cleaning" (A277), presumably meaning that … he cleaned his weapon, the very thing he claimed not to have done. In short, the exhibit offered by defendant in support of his explanation in fact torpedoed it. Despite the disastrously unavailing nature of this evidence, the court below effectively credited same by noting, without further discussion, that the record "confirm[ed]" that appellee had participated in the firing range program (A282), as if the document might reasonably explain the ballistics finding.

Politopoulos's written statement:

Politopoulos's written "narrative" of his role in the event is reflected in his signed statement (A104) dated March 19, 2005, i.e., the date of the shooting. Appellant has no hesitation in asserting that it amounts to an affirmative, explicit denial that he fired: the report merely describes the route travelled by appellee and his partner, Officer Farina, to the scene Alexander Street, and their observations before they "exited the radio car, parked just north of the suspect vehicle, and along with additional responding units proceeded to secure the scene." To the extent, therefore, that YPD based its representations concerning who fired on Politopolous's effective denial that he fired, appellant submits that, as discussed below, the decision not to sue him initially was based directly on his own written statement, and not merely that of persons with whom he conspired and/or was united in interest legally.

NYSP's complicity:

The Court should also be aware of the extent of the New York State Police's (NYSP's) active complicity in the withholding of information concerning the Politopoulos-ballistics issue. Though not categorically bereft of allusion to the matter like those produced by Yonkers, the 322 pages of documents produced by the State in the companion action were very nearly devoid of reference to the ballistics issue. Lest anyone imagine, however, that it did not garner attention, the

10

State Police did manage to let slip one document expressly acknowledging it.

Specifically, at page NYSP0159 (A273) of a document identified as a Report of

Personnel Investigation dated April 4, 2005 (A263-74), the NYSP noted that, in the

ballistics report received from the Westchester Crime Lab,

> six of the eleven firearms had evidence of discharge, two from NYSP and
> four from City of Yonkers PD. This is one more firearm discharged than
> City of Yonkers had accounted. Investigation into this is still pending and
> Yonkers Police Department is attempting to ascertain if the firearm had been
> discharged earlier in the night or prior to the date of the incident during an
> animal destruction.

A273.

Presumably hopeful that investigation into this "discharged" firearm would

in fact take place, the author of this report concluded it by noting that the NYSP

investigation remained open pending an "interview of involved City of Yonkers

Police Officers and associated reports." Id. at NYSP0163 (A274).

No such interview ever occurred, and the internal affairs investigator for the

State Police, Lieutenant Galbraith (Captain Loughran at the time of her deposition)

testified at length that she was ultimately thwarted in all efforts to interview the

Yonkers officers, and was ultimately informed by her superior, Inspector Martin,

that he had spoken with a Lieutenant Murphy at Yonkers and that they "were not

going to be interviewed in this case." Loughran deposition at 149 (A219). In the

end, Galbraith was effectively instructed to shut down any further investigation

into the circumstances of a police homicide when an open issue obviously

remained over who fired. Asked if, in her professional opinion, this was standard police practice in a case of this gravity, she effectively refused to answer. Thus, in the face of YPD's intransigence regarding further scrutiny of the matter, the New York State Police were ultimately content to go along, drop their investigation and join in a charade by which law officers would willfully mischaracterize the essential contents of a ballistics analysis, as emblemized by the following statement from an undated seven-page document reflecting the State's purported investigation into the shooting:

> On 3/25/05 a report of ballistics testing was prepared by Detective Sergeant Frank Nicolosi and Detective Sergeant Anthony Tota, Westchester County Police Ballistics Unit, for W-1 through W-10, shell casings recovered at the scene, and bullets recovered by Louis Roh during the autopsy. <u>This report indicates that the service weapons of Troopers O'Brien and Sammon and of Detective Kraft and P.O.'s Pilots and Wissner, all showed evidence of discharge in the barrels</u>.

NYSP "Continuation Sheet," at page 5, ¶ 14, NYSP 0015-0021 at 0019 (A269) (emphasis added). While nothing about the above is literally inaccurate, its conspicuous omission to mention the *additional* service weapon that was likewise shown, in precisely the same report, to have evidence of discharge in its barrel speaks volumes, and leaves no doubt whatsoever that persons within the NYSP willfully abetted Yonkers's effort to suppress any official version of events that might have incriminated Politopoulos.

# SUMMARY OF ARGUMENT

Regardless of the procedural history, the district court's determination that there was not such concealment as to have tolled accrual until production of the ballistics report was manifest error. Most notably for purposes of this appeal, and as the court below indeed noted, YPD produced no documents whatsoever addressing, let alone ruling out, the possibility that defendant fired notwithstanding that the ballistics results characterizing his pistol in terms identical to those of the conceded shooters ("evidence of discharge in barrel"). The court's finding, moreover, that YPD in fact conducted an "investigation" into the issue raised by the ballistics analysis was glaringly at variance with the record. Appellant accordingly alleged that YPD, and by extension that defendant himself, who likewise denies that he fired, conspired to mask the central fact alleged in this case. In order to determine that there was no such concealment, the court below effectively decided the merits of the action's central allegation: Judge Stein credited defendant's self-serving denials that he fired and YPD's wholly conclusory statements to the same effect while effectively ignoring the ballistics analysis. To the extent that the court looked to additional evidence purportedly consistent with these denials, its conclusions were clearly erroneous, and ignored other record testimony and documents overwhelmingly consistent with a

probability that defendant in fact fired and that he and his employer concealed--and are still concealing--the fact.

## ARGUMENT

**THE RECORD AMPLY SUPPORTED APPELLANT'S CLAIM THAT APPELLEE, AND PERSONS WITH WHOM HE WAS UNITED IN INTEREST, FRAUDULENTLY CONCEALED THE FACT OF HIS SHOOTING.**

It is axiomatic that "[w]hen a 'defendant fraudulently conceals the wrong, the time [limit of the statute of limitations] does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action." Pinaud v. County of Suffolk, 52 F.3d 1139, 1157 (2d Cir.1 995). Whether viewed as a toll relating to an already-accrued claim or a delay of accrual itself, see Pearl v. City of Long Branch, 296 F.3d 76, 80-89 (2d Cir. 2002), the effect of appellee's actions was to start the three-year clock running no earlier than the time YPD first gave plaintiff any reason whatsoever to believe that, notwithstanding YPD's earlier representations, more than three of its officers had fired. This could have been no earlier than the time the YPD defendants, by counsel, produced the ballistics report on March 8, 2008, making commencement less than three years later timely. The Court is also reminded, as was the district court, that this further assumes that plaintiff should have immediately recognized the issue despite its being buried deep within the larger (roughly 115 page) group

of documents produced by Yonkers and the vastly larger group of documents (roughly 322 pages) produced by NYSP, notwithstanding that both groups of documents were almost completely silent about the possibility of an additional shooter to those who had been long since been officially identified. It also ignores the roughly five-month period that plaintiffs were unrepresented by counsel following their prior attorney's death in August, 2008.

The district court's sustained conclusion (A290-93) that appellant failed to present evidence of active, "purposeful" concealment was, for the reasons stated above, wholly at variance with the record as set forth above. To some extent it assumes that plaintiff was required to demonstrate Politopoulos's own affirmative acts of concealment, rather than merely those of persons with whom he was legally united in interest (i.e., his employer) and with whom he in any event was alleged to have conspired to conceal the fact. But appellant had expressly alleged, and the evidence made clear, that such a conspiracy took place, tolling and/or delaying accrual of the statute of limitations, see Dory v. T. Ryan, 999 F.2d 679 (2d Cir. 1993) (citing Keating v. Carey, 706 F.2d 377, 381 (2d Cir.1983)). Nor does the district court begin to identify how else, prior to the production of the ballistics report, the Horn family could possibly have known what transpired on the fatal evening, or that law enforcement was lying in its previous statements to them. In that regard the facts of this matter differ sharply from those of Paige v. Police

<u>Department of Schenectady</u>, 264 F.3d 197, 200 (2d Cir.2001) where this Court acknowledged that a limitation period could be tolled by fraudulent concealment of a cause of action in a section 1983 police brutality suit, but ruled that the suit was time-barred because the plaintiff had enough information when she became an adult to bring her claim. <u>See id</u>. at 199-200 ("Although some of the facts putatively concealed by the defendants might have strengthened [the plaintiff's] case by corroborating her story, we find that the absence of those facts did not sufficiently justify [the plaintiff] in not pursuing her cause of action as to merit equitable tolling"), and directly evoke the language of <u>Bell v. Milwaukee</u>, 746 F.2d 1205 (7th Cir.1984), in which equitable tolling was permitted, because, as this Court charactertized it in <u>Pearl</u>,

> [t]he central fact underlying the decision … was that, because Daniel Bell was killed by the officers, his family lacked specific, firsthand information about what had occurred. They were aware of the death, but not of the facts that made the death actionable. Although Bell's family did not believe the reports and testimony relating to the shooting, the family had no basis for knowing or proving what actually happened because Bell did not survive to tell his version of the episode.

<u>Pearl v. City of Long Branch</u>, supra, 296 F.3d 76, 85 (2d Cir. 2002).

Lastly, appellant would briefly address the district court's additional suggestion that plaintiff's lack of diligence in commencing the instant action after receiving the ballistics report affected the tolling of the statute. As noted above, and as the court largely agreed, the statute either began running as of that time or it

16

did not. If it did, then commencement less than three years later was timely under the doctrine of equitable estoppel and/or equitable tolling. In any case, and as discussed above, plaintiff's successor counsel sought to interpose this claim roughly a year after taking over the case (which was itself roughly a year after the report was produced), but in the interim had vigorously pursued discovery in order to confirm the likelihood that such a claim existed notwithstanding defendant's official, and YPD's continuing, denials.

## **CONCLUSION**

Appellant adduced more than sufficient evidence of purposeful, wrongful concealment of appellee's firing his gun at appellant's decedent.  The district court's determination to the contrary, and its finding that the action was accordingly time-barred, was clear error, and the decision should be reversed and the action reinstated.

Dated: New York, New York
       November 5, 2014

Respectfully submitted,

_____

WILLIAM A. THOMAS (WT 0116)

Attorney for Plaintiff-Appellant
89 Fifth Avenue, Suite 900
New York, New York 10003
(212) 741-8900

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.      I certify that this brief complies with the type-volume limitation of

Fed.R.App.P.32(a)(7)(B) because:

This brief contains 3,925 words, excluding the parts of the brief exempted by Fed.R.App.32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of

Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P32(a)(6)

because:

This brief has been prepared in proportionally spaced typeface using Microsoft Word 97-2003, in Times New Roman, font size 14.

Dated:      New York, New York
            Dated: November 5, 2014

Special Appendix

**i**

## Table of Contents
## (Special Appendix)

**Page**

Decision at Trial of Honorable Sidney H. Stein,
Dated June 20, 2014 ................................................................SPA-1

Order of Honorable Sidney H. Stein, Dated June 20, 2014,
Appealed From, with Clerk's Judgment Attached thereto ........SPA-30

SPA-1

E6kdhord
                         Decision

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CHESTER HORN, Individually,
     and as Administrator of the
4    ESTATE OF DAVID HORN, GLADYS
     HORN, DAVID HORN, JR., DIANA
5    HORN and PATRICIA HORN,

6                    Plaintiffs,          New York, N.Y.

7              v.                         11 Civ. 1482(SHS)

8    CITY OF YONKERS POLICE OFFICER
     DEAN POLITOPOULOS,
9
                     Defendant.
10
     ------------------------------x
11
                                          June 20, 2014
12                                        2:42 p.m.

13   Before:

14                  HON. SIDNEY H. STEIN,

15                                        District Judge

16                    APPEARANCES

17   WILLIAM A. THOMAS, ESQ
          Attorney for Plaintiffs
18   BY:  WILLIAM ALLINSON THOMAS
          JASON M. BAXTER
19
     MICHAEL V. CURTI
20        Corporation Counsel of the
          City of Yonkers
21        Attorney for Defendant
     BY:  JOHN De ANGELI
22            Assistant Corporation Counsel

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

SPA-2

E6kdhord
                          Decision

1           THE CLERK:  Horn, et al. v. City of Yonkers Police

2    Officer Dean Politopoulos, 11 Civ. 1482.

3           Counsel, please state your appearance for the record.

4           MR. THOMAS:  Good afternoon, your Honor.  William A.

5    Thomas for plaintiff, and with me is my co-counsel Jason M.

6    Baxter.

7           THE COURT:  Good afternoon.

8           MR. De ANGELI:  Judge, for City of Yonkers, John De

9    Angeli.

10          THE COURT:  All right.  Good afternoon.  Please be

11   seated.

12          Let's go off just for a moment, Vincent.

13          (Discussion off the record)

14          THE COURT:  I have a decision, as I've notified the

15   parties, which I want to read into the record.  The decision

16   grants the motion of the defendant for summary judgment.  The

17   decision is as follows.

18          Plaintiffs, the family members of decedent David Horn,

19   bring this Section 1983 action individually and on behalf of

20   Horn's estate against City of Yonkers Police Officer Dean

21   Politopoulos.  Plaintiffs allege that Officer Politopoulos used

22   excessive force against Horn in violation of the Fourth

23   Amendment by shooting him after a car chase, which also

24   deprived Horn's family members of their constitutional right of

25   association with Horn.  Plaintiffs also seek to recover damages

3

E6kdhord
                          Decision

1   for Politopoulos's allegedly covering up his role in the

2   shooting.

3          Politopoulos now moves for summary judgment in his

4   favor pursuant to Federal Rule of Civil Procedure 56(c).  The

5   Court grants the motion with respect to plaintiffs' excessive

6   force and right of association claims on the ground that they

7   are time-barred, and I am granting the motion with respect to

8   the claims alleging a cover-up because plaintiffs have failed

9   to present any evidence suggesting that defendant participated

10  in a cover-up.

11  I.        BACKGROUND

12         The following facts are drawn from the record.  I view

13  the evidence, as I have to, in the light most favorable to the

14  nonmoving party, and I draw all reasonable inferences in favor

15  of the nonmoving party.  Fabozzi v. Lexington Insurance Co.,

16  601 F.3d 88, 90 (2d Cir. 2010).

17         On March 19, 2005, Politopoulos was at a stationary

18  post in a radio car with his partner, Officer Farina.  At

19  approximately 12:45 a.m., two New York State troopers --

20  defendants in a related action filed by plaintiffs, 07 Civ.

21  7822 -- began the pursuit of a vehicle driven by decedent David

22  Horn.  (That's Plaintiffs' 56.1 statement, Paragraph 2 and

23  Paragraph 3.)  Politopoulos and Farina learned through a radio

24  dispatch that the pursuit was approaching their area.  (56.1 at

25  Paragraph 6 and 8.)  Farina began driving the radio car in the

SPA-4

E6kdhord

                         Decision

1    direction of the pursuant.  Farina and Politopoulos heard

2    through the dispatch that shots had been fired.  As they turned

3    onto Alexander Street, they observed Horn's vehicle coming

4    toward them, strike a utility pole, and flip over.

5    Politopoulos exited the radio car and drew his weapon.  The

6    parties disagree as to whether Politopoulos fired at Horn.

7    (That's Plaintiffs' 56.1 statement, Paragraphs 10, 16, 17, 24

8    and 28, and also Defendant's 56.1 statement at Paragraph 28.)

9    Horn died of bullet wounds and hemorrhages.  (Exhibit D to the

10   Declaration of William Thomas dated July 2, 2013.)

11        Following Mr. Horn's death, the Internal Affairs

12   Division of the Yonkers Police Department conducted an

13   investigation.  (Exhibits A and B to Exhibit A to the Thomas

14   Declaration.)  The investigation concluded that only three

15   Yonkers police officers -- that is, Officers Pilot, Wissner,

16   and Craft -- had in fact fired their weapons at Horn.  (Exhibit

17   A to Exhibit A to the Thomas Declaration.)  None of the

18   recovered bullet casings matched Politopoulos's weapon.

19   (Exhibit G and Exhibit J to the Brady Declaration at 3-6.)

20   Moreover, Politopoulos and Farina both testified that

21   Politopoulos never fired his gun.  (Exhibit B to the Thomas

22   Declaration at 157, Exhibit C to the Declaration of Shannon

23   Brady of May 10, 2012 -- It says 2012 but it is fairly obvious

24   that it's 2013 -- (the "Brady Declaration"), at 60.)  The

25   ballistics report prepared by the county firearms examiners,

E6kdhord
                          Decision

1    however, notes evidence of discharge in the barrel of

2    Politopoulos's gun, which was collected for analysis on the

3    night of the incident.  (Exhibit G to the Brady Declaration,

4    Exhibit J to the Brady Declaration, at 10.)  Politopoulos told

5    Internal Affairs that the discharge was attributable to

6    inadequately cleaning his weapon after using it at the firing

7    range several weeks before Horn's death.  (Exhibit B to Thomas

8    Declaration, at 62-63.)  Records maintained by the Yonkers

9    Police Department confirm that Politopoulos participated in a

10   "Firearms Requalification & In-Service Training Program" on

11   February 22, 2005.  (Exhibit G to the Brady Declaration.)

12          The Internal Affairs reports did not include any

13   discussion of the fact that Politopoulos's weapon had tested

14   positive for discharge, nor do they expressly consider whether

15   he played any role in Horn's death.  (Exhibits A and B to

16   Exhibit A of the Thomas Declaration.)  Rather, Internal Affairs

17   concluded only that "from our investigation three Yonkers

18   Police Officers fired their Glocks.  Police Officer Pilot fired

19   16 rounds, Police Officer Wissner fired three rounds and

20   Detective Craft fired one round..."  (Exhibit A to Exhibit A to

21   the Thomas Declaration.)

22          On September 5, 2007, plaintiffs filed a lawsuit

23   pursuant to 42 U.S.C. Section 1983 -- that is the "O'Brien

24   action" -- against New York State Troopers O'Brien and Sammon

25   and Yonkers Police Officers Pilot, Wissner, and Craft.  (That's

SPA-6

6

E6kdhord
                        Decision

1    Horn v. O'Brien, 07 Civ. 7822.)  Politopoulos was not named as

2    a defendant in the O'Brien litigation.  On either March 3 or

3    March 8, 2008 -- shortly before the expiration of the statute

4    of limitations -- plaintiffs received defendants' Rule 26

5    initial disclosures, which included the ballistics report.

6    (Exhibit A to the Thomas Declaration, Plaintiffs' Memorandum of

7    Law in Opposition to this motion at 9.)  Now, I would say it

8    was either March 3 or March 8 because while the O'Brien

9    defendants' Rule 26 disclosures were dated March 3, 2008, the

10   plaintiffs state that they were actually produced on March 8.

11   You will see, however, that, through my determination in terms

12   of the statute of limitations, is irrelevant as to whether it

13   was March 3 or 8.  Although the ballistics report listed only

14   the serial numbers of the weapons that had tested positive for

15   discharge, the document immediately preceding the report linked

16   one of the serial numbers to Politopoulos.  (Exhibits SS-TT to

17   Exhibit A to the Thomas Declaration.)

18       Two years and two months later, in May of 2010,

19   plaintiffs requested permission of the Court to add

20   Politopoulos as a defendant in the O'Brien action despite the

21   fact that the statute of limitations had expired.  (That is

22   Exhibit M to the Brady Declaration.)  Plaintiffs contended that

23   the O'Brien defendants had wrongfully concealed Politopoulos's

24   potential role in the shooting and that they could not have

25   discovered his involvement -- that is, the plaintiffs could not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-7

E6kdhord
                        Decision

1    have discovered Politopoulos's involvement -- until the date

2    they received the initial disclosures; that is, in March of

3    2008, which I note again was two years and two months before

4    they even came to the Court to request permission to add

5    Politopoulos as a defendant.  That request was denied by

6    Magistrate Judge Yanthis, who at that time was supervising this

7    case for general pretrial.  Magistrate Judge Yanthis found

8    undue delay based on the fact that plaintiffs waited more than

9    two years after receiving the ballistics report to seek leave

10   of the Court to add Politopoulos as a defendant, as I just

11   said.

12        On March 3, 2011, plaintiffs filed this litigation

13   against Politopoulos; that is, Horn v. Politopoulos, 11 Civ.

14   1482.  The complaint in this action lists two explicit claims

15   for relief pursuant to 42 U.S.C. Section 1983: use of excessive

16   force in violation of Mr. Horn's constitutional rights on

17   behalf of the estate of Mr. Horn, and violation of Mr. Horn's

18   family members' constitutional rights to Mr. Horn's

19   companionship.  It also sets forth a request for punitive

20   damages, which is not a separate claim for relief but is an

21   element of damages, a form of damages that were requested.  The

22   complaint alleges, in addition, though not in a distinct claim

23   for relief, that Politopoulos "agreed to and did take

24   affirmative steps to fraudulently conceal ... the fact of

25   defendant's shooting" of Horn; but it does not state what

SPA-8

8

E6kdhord
Decision

1    constitutional right that alleged cover-up violated.  (That's

2    the Complaint at Paragraphs 1 and 16.)  The defendant now has

3    moved for summary judgment primarily on the ground that

4    plaintiffs' claims are time-barred; alternatively, he argues

5    that Judge Yanthis's order precludes the claims, that there are

6    no issues of material fact, and that defendant is entitled to

7    qualified immunity.

8    II.      DISCUSSION

9         A.  Summary Judgment Standard

10        You three gentlemen certainly know the standard for

11    summary judgment.  I am not going to go through it at length.

12    I can only grant it where the moving party demonstrates there

13    is no genuine issue as to any material fact, and that the

14    movant is entitled to judgment as a matter of law.  The

15    nonmoving party bears the ultimate burden of proof at trial.

16    And the plaintiff -- sorry, the movant, the defendant in this,

17    may show prima facie entitlement to summary judgment by

18    demonstrating the absence of a genuine issue of material fact

19    based on insufficiencies in the record.  In the event that that

20    happens, the nonmoving party has to come forward with

21    admissible evidence sufficient to raise a genuine issue of fact

22    at trial.  The party opposing summary judgment can't rely on

23    conclusory allegations, but has to offer hard evidence in

24    support of his assertions.  And the defendant who is seeking

25    summary judgment will prevail if the plaintiff does not come

SPA-9

E6kdhord
                                Decision

1    forward with enough evidence to create a genuine factual issue

2    to be tried with respect to an element essential to its claim.

3    That's Allen v. Coughlin and Celotex Corp. v. Catrett.  That is

4    Salahuddin v. Goord, Cordiano v. Metacon Gun Club, Inc. and

5    D'Amico v. City of New York, as well as Allen v. Cuomo.

6           B.  Plaintiffs' Excessive Force and Right of

7    Association Claims I Find to be Time-Barred.

8           The 1983 claims, of course, are subject to the New

9    York State three-year statute of limitations for personal

10   injury actions.  Again, that is something the parties

11   understand.  Pearl v. City of Long Beach, 296 F.3d 76, 79, (2d

12   Cir. 2002).  Plaintiffs do not appear to dispute that their

13   excessive force and right of association claims occurred on

14   March 19, 2005, when David Horn died.  That is indisputably

15   when plaintiffs became aware of the facts underlying their

16   claims to relief, and, in fact, plaintiff Chester Horn was

17   present at the scene of David Horn's death.  See Pearl, 296

18   F.3d at 80.  (See also Exhibit B to Exhibit A to the Thomas

19   Declaration at 14.)  Instead, the plaintiffs argue that

20   defendant's alleged concealment of his role in the shooting

21   tolled the statute of limitations until March 3 or 8, 2008,

22   when the plaintiffs received the ballistics report.  As you'll

23   see, I conclude as a matter of law that there is no concealment

24   of Politopoulos's role in the shooting.

25           1.  Legal Standard Governing Equitable Estoppel.

SPA-10

E6kdhord
                           Decision

1          I have already set forth the legal standard for

2   summary judgment, and now I will set forth the legal standard

3   governing equitable estoppel.

4          I'm going to go downstairs now and take that

5   conference call.  Again, I apologize.  But if you will be back

6   in 15 minutes from now, we will continue.  Thank you.

7          (Recess)

8          1.  Legal Standard Governing Equitable Estoppel

9          New York State tolling rules govern the tolling of the

10  limitations period for Section 1983 actions, unless applying

11  those rules would frustrate the federal policy goals of

12  "compensation of persons injured by a deprivation of federal

13  rights and the prevention of abuses of power by those acting

14  under color of state law."  Moses v. Westchester County

15  Department of Corrections, 951 F.Supp.2d 448, 454 (S.D.N.Y.

16  2013).  See also Wallace v. Kato, 549 U.S. 384, 394 (2007),

17  Abbas v. Dixon, 480 F.3d 636, 641 (2d Cir. 2007).  Although

18  plaintiffs ask the Court to impose equitable tolling, the

19  applicable New York doctrine is actually equitable estoppel.

20  Pearl, 296 F.3d at 82 (stating that equitable estoppel is the

21  correct label under New York State law); O'Hara v. Bayliner, 89

22  N.Y.2d 636, 646 (1997); Ari v. Cohen, 107 A.D.3d 516, 517 (1st

23  Dep't 2013.)  Equitable estoppel has been characterized as an

24  "uncommon remedy."  Ross v. Louise Wise Servs., Inc., 8 N.Y.3d

25  478, 491 (2007).

SPA-11

E6kdhord
                          Decision

1        The cases demonstrate that the plaintiffs have to meet

2    two requirements in order to successfully invoke equitable

3    estoppel to, in effect, extend the statute of limitations.

4    That is, first, they have to prove that they were not "induced

5    by fraud, misrepresentations or deception to refrain from

6    filing a timely action."  Abbas, 480 F.3d at 642.  The

7    plaintiffs have to show that defendant actively concealed the

8    wrong.  That's what Abbas says.  That's what Putter v. North

9    Shore University Hospital, 7 N.Y.3d 548, 552 (2006) say, as

10   well as Kamruddin v. Desmond, 293 A.D.2d 714, 715 (2d Dep't

11   2002).  That last case teaches that "purposeful concealment" is

12   required.  Where, as here, there is absolutely no fiduciary

13   relationship between the plaintiffs and the defendant, "mere

14   silence or failure to disclose the wrongdoing is insufficient."

15   Ross, 8 N.Y.3d at 491; See also Corsello v. Verizon New York,

16   Inc., 18 N.Y.3d 777, 789 (2012).  As the New York Court of

17   Appeals put it, in Zumpano v. Quinn, 6 N.Y.3d 666 at 675, "a

18   wrongdoer is not legally obligated to make a public confession,

19   or to alert people who may have claims against it, to get the

20   benefit of a statute of limitations."

21       Federal courts have sometimes tolled the limitations

22   period in unique cases where plaintiffs are unable to

23   demonstrate fraud, misrepresentation, or deception, but

24   "extraordinary circumstances" may justify tolling.  See Moses

25   at 951 F.Supp.2d at 454; Hargroves v. City of New York, 694

SPA-12

E6kdhord
                            Decision

1   F.Supp.2d 198, 212 (E.D.N.Y. 2010), reversed on other grounds,

2   and summary opinion at 411 F. App'x 378 (2d Cir. 2011); see

3   also Walker v. Jastremski, 430 F.3d 560, 564 (2d Cir. 2005).

4   In that case, the Court concluded there were no extraordinary

5   circumstances that existed.  So, too, there are none here, and

6   I'll go into that in a moment.  The extraordinary circumstances

7   prong, as it were, of the ability to toll the limitations

8   period, however, is available only when applying New York's

9   active concealment requirement would conflict with the policies

10  underlying Section 1983, that is, when they would conflict with

11  the policy of compensating injured persons and preventing

12  abuses of power by those acting under color of state law.  See

13  Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir.

14  1980); Moses, 951 F.Supp.2d at 454.

15        Second, plaintiffs seeking to rely on equitable

16  estoppel must show they exercised reasonable diligence to

17  discover their cause of action and file suit.  Abbas, 480 F.3d

18  at 642; Simcuski v. Saeli, 44 N.Y.2d 442, 450 (1978).  The

19  reasonably diligence requirement involves two separate but

20  related concepts.  Plaintiffs have to act with reasonable

21  diligence throughout the period they seek to toll.  See Pearl,

22  296 F.3d at 84, 88; Pinaud v. County of Suffolk, 52 F.3d 1139,

23  1158 (2d Cir. 1995); Cullen v. City of New York, 2010 WL

24  6560742 at *11 (E.D.N.Y. 2010); and Kotlyarsky v. New York

25  Post, 195 Misc.2d 150, 154 (Kings County 2003).  But they must

SPA-13

E6kdhord
                        Decision

1    also demonstrate that "the action was brought within a

2    reasonable time after the facts giving rise to the estoppel

3    have ceased to be operational."  Simcuski, 44 N.Y.2d at 450;

4    see also Abbas, 480 F.3d at 642; Mohamed v. Donald J. Nolan,

5    Ltd., 967 F.Supp.2d 647, 657 (E.D.N.Y. 2013).  In other words,

6    plaintiffs must demonstrate both that "the failure to timely

7    commence the lawsuit is not attributable to a lack of diligence

8    on their part."  Kotlyarsky at 154, and that they did not

9    unduly delay filing suit once the wrongful concealment was

10   discovered.  Abbas, 480 F.3d at 642, and Simcuski, 44 N.Y.2d at

11   450.  Reasonable diligence is required whether the request for

12   equitable estoppel is based on active concealment or

13   "extraordinary circumstances."  See Walker, 430 F.3d at 564;

14   Moses, 951 F.Supp.2d at 455.

15             2.  Plaintiffs Are Not Entitled to Equitable Estoppel.

16             So what I've done is I've set forth the very high

17   standards that have to be met before I can impose equitable

18   estoppel here, or permit there to be equitable estoppel I think

19   is a better way of saying it.  And now I am going to set forth

20   why the plaintiffs are not entitled to equitable estoppel.

21   Primarily, they don't meet either of the prongs of the test;

22   that is, they haven't presented any evidence whatsoever that

23   Politopoulos actively concealed information.  That is simply

24   not in this record.  And, similarly, they haven't demonstrated

25   that there are extraordinary circumstances here that prevented

SPA-14

E6kdhord
Decision

1    them from timely filing suit.  And as I said, those are the two

2    hurdles.  Equitable estoppel is relatively rarely imposed, and

3    the conditions simply don't exist here.

4         So let's go now to Subdivision "a":  Plaintiffs Have

5    Not Presented Any Evidence That Politopoulos Actively Concealed

6    Information.

7         Plaintiffs have failed to raise a genuine factual

8    issue regarding Politopoulos's active concealment of his

9    possible role in Horn's death.  Plaintiffs simply assert that

10   Politopoulos did not disclose the ballistics report until just

11   before the expiration of the statute of limitations, that the

12   report was buried deep within a pile of documents --

13        You will see it turns outs that the pile of documents

14   is about an inch, maybe an inch-and-a-half thick -- hardly

15   constitutes a pile in this day of discovery matters.

16        -- and that the Internal Affairs reports did not

17   identify Politopoulos as a possible shooter.  But failing to

18   disclose documents before a discovery request is received for

19   them does not support the application of equitable estoppel.

20   Singh v. Wells, 445 F. App'x 373, 378 (2d Cir. 2011).

21   Plaintiffs state in their opposition brief at 10 that the

22   Yonkers Police Department was obligated under the law to

23   immediately inform them of the findings of the ballistics

24   report.  Not surprisingly, they don't cite any citation for

25   that obligation, and I failed to have uncovered one by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-15

E6kdhord
                        Decision

1    independent research by my chambers.

2           In addition, plaintiffs have not set forth a credible

3    reason why the Internal Affairs' conclusion that Politopoulos

4    did not fire his weapon constitutes active concealment,

5    especially considering that evidence aside from the ballistics

6    reports suggested that Politopoulos in fact did not fire his

7    weapon.  In addition, plaintiffs received the ballistics report

8    more than two years before they filed this litigation, and were

9    free to draw their own conclusions from it for over two years.

10   And the fact that the ballistics report was allegedly situated

11   toward the end of the packet, which really is single-sided

12   pages of approximately an inch -- that's generous, actually --

13   does not indicate that Politopoulos either intended to or

14   attempted to conceal its contents.  Nor have plaintiffs alleged

15   that Politopoulos or the Yonkers Police Department lied to them

16   concerning the ballistics report or refused to respond to their

17   requests for information.  There is nothing in this record at

18   all about that.  See Svenska Finans Int'l BV v. Scolaro,

19   Shulman, Cohen, Lawler & Burstein, P.C., 37 F.Supp.2d 178, 185

20   (N.D.N.Y. 1999); Kamruddin, 293 A.D.2d at 715.

21          In sum, although plaintiffs' Complaint and its

22   Memorandum of Law are rife with bald legal conclusions that

23   Politopoulos actively participated in a cover-up that

24   frustrated plaintiffs' efforts to bring suit, there is not a

25   single piece of factual evidence that Politopoulos engaged in

SPA-16

E6kdhord

Decision

1    any active, purposeful concealment or any form of a cover-up

2    whatsoever.  See Pinaud, 52 F.3d at 1157.  Plaintiffs have not

3    "articulated any acts by defendants that prevented them from

4    timely commencing suit.  Abbas, 480 F.3d at 642.  And therefore

5    they cannot claim the benefit of equitable estoppel on that

6    basis.  See also Picture Patents, LLC v. Aeropostale, Inc., 788

7    F.Supp.2d 127, 143 (S.D.N.Y. 2011).

8            All right.  So I've handled the active concealment

9    prong.  Now we will go to "b":  Plaintiffs Have Not

10   Demonstrated Any "Extraordinary Circumstances" That Prevented

11   Them From Timely Filing Suit.

12           Plaintiffs have not pointed to any extraordinary

13   circumstances that would justify the tolling by the Court of

14   the statute of limitations.  There is no unforeseeable,

15   intervening change in the law that renders their formerly

16   timely lawsuit time-barred.  See Hargroves, 694 F.Supp.2d at

17   211-212.  Nor have plaintiffs alleged a so-called "perfect

18   storm" of facts supporting tolling akin to that in Moses v.

19   Westchester County Department of Corrections, 951 F.Supp.2d

20   448, 454 (S.D.N.Y. 2013).  In Moses, a homeless, mentally ill

21   immigrant was detained in the county jail, beaten unconscious,

22   and hospitalized in a coma until he died fourteen months later.

23   Law enforcement officials were unable to locate his estranged

24   family members, who lived abroad, for over five years.  The

25   decedent's mother, after being located, initiated the process

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-17

E6kdhord
                        Decision

1    of appointing an administrator for her son's estate and

2    investigating her legal options, and initiated her Section 1983

3    lawsuit several years later.  That's Moses at 452 to 454.  The

4    Court determined that the unique combination of the decedent's

5    mental illness and later incapacitation, his family's

6    completely innocent unawareness of the fact of his death and

7    their lack of knowledge of the U.S. Court system and even the

8    English language altogether constituted extraordinary

9    circumstances that permitted the Court to toll the statute of

10   limitations.  The Court did note that denying tolling would

11   undercut the policies underlying Section 1983 because it would

12   signal the state officials that they had the ability to violate

13   the rights of foreign-born or mentally ill persons with some

14   degree of impunity.

15       Plaintiffs here, of course, allege no such

16   extraordinary circumstances.  They don't argue that they have

17   been prejudiced by an unexpected change in the law, as the

18   Hargroves plaintiffs argued and were successful in arguing.

19   694 F.Supp.2d at 212-213.  Nor do they point to any unusual

20   geographic, linguistic or medical difficulties that prevented

21   them from filing suit in a timely fashion, as happened in

22   Moses.  The facts on which they rely for tolling -- that is,

23   the defendants waiting to disclose the ballistics report until

24   Rule 26 initial disclosures were due, the placement of that

25   report allegedly at the end of an inch-thick packet of

SPA-18

E6kdhord
Decision

1    discovery material, as well as Internal Affairs' conclusion

2    that Politopoulos in fact did not fire -- do not qualify as

3    extraordinary circumstances.  To say they did would certainly

4    contravene the policy of making tolling available only in "rare

5    and exceptional circumstances."  That's Walker, 430 F.3d at

6    564.

7              C.  Plaintiffs Have Not Presented Any Evidence That

8    They Exercised Reasonable Diligence in Filing the Suit.

9              Plaintiffs have failed to come forward with any facts

10   demonstrating that they exercised reasonable diligence during

11   and after the time period they seek to toll.  They waited more

12   than two-and-a-half years to file the complaint in the O'Brien

13   action.  See Walker, 430 F.3d at 566 (Newman, J. concurring).

14   Had they filed their suit sooner, they could have utilized the

15   discovery process to learn about Politopoulos's alleged actions

16   well within the limitations period.  Compare Pearl, 296 F.3d at

17   88.

18             Furthermore, plaintiffs do not provide any information

19   as to what, if any, investigation of their potential claims

20   they undertook during the lengthy period preceding their filing

21   of the O'Brien complaint.  Indeed, there is no evidence they

22   ever even asked the Yonkers Police Department for the names of

23   the officers who had been present at the scene of Horn's death.

24   See Rogers v. Apicella, 606 F.Supp.2d 272, 284 (D. Conn. 2009)

25   (Noting that plaintiff there had not sought discovery on other

SPA-19

E6kdhord
                        Decision

 1  potentially liable parties).  Plaintiffs here have failed to

 2  point to a genuine dispute of material fact regarding their

 3  diligence during the period they seek to toll.

 4          Also, plaintiffs offer no justification for the

 5  three-year delay spanning their receipt of the ballistics

 6  report and the filing of this complaint.  They didn't seek to

 7  add him as a defendant in the O'Brien action until more than

 8  two years after the ballistics reports -- that is, after the

 9  alleged concealment ended.  (Exhibit M to the Brady

10  Declaration)  And even then, they waited almost nine months

11  after Judge Yanthis had denied their request before finally

12  commencing this litigation.  (Exhibit M to the Brady

13  Declaration and the Complaint at 4.)  This unexplained delay

14  counsels strongly in favor of denying equitable estoppel.  See

15  Mohamed, 967 F.Supp.2d at 657.

16          In sum, plaintiffs have not presented any evidence

17  that it was "impossible ... to learn about [their] cause of

18  action."  Pearl, 296 F.3d at 85.  And I must say in the

19  original, the word "impossible" was in italics.  Because

20  plaintiffs are not entitled to invoke the benefit of equitable

21  estoppel, their excessive force and right of association claims

22  are time-barred along with their request for punitive damages

23  based on excessive force and right of association.

24          C.  Defendant is Entitled to Summary Judgment on

25  Plaintiffs' Claim that He Engaged in a Cover-Up.

E6kdhord
                        Decision

1        There is simply no evidence of a cover-up here.  It is

2   as simple as that, but I will go through it at somewhat more

3   length.

4        1.  Plaintiffs Do Not Explain Which Constitutional

5   Right the Alleged Cover-Up Violated.

6        Plaintiffs' Complaint alleges, although not in a

7   delineated claim for relief, that Politopoulos "individually

8   and acting in concert and conspiracy with other persons, all

9   acting under color of state law, agreed to and did take

10  affirmative steps to fraudulently conceal, from plaintiffs and

11  the public the fact of defendant's shooting of plaintiff ...

12  and to conceal, mask and falsify other key facts surrounding

13  said shooting."  (Complaint at Paragraph 16.)

14       It is not entirely clear whether plaintiffs included

15  these allegations in order to provide support for their request

16  for equitable estoppel or to assert another claim for relief

17  based on a cover-up.  In the beginning paragraph of the

18  Complaint they state that the action was brought "to recover

19  damages for covering up murder and other violations of

20  Plaintiff's rights."  (Complaint Paragraph 1.)  I therefore

21  will read this section broadly and treat the allegations of a

22  cover-up as a separate claim for relief, although I'm not quite

23  sure what cause of action the plaintiffs are trying to assert.

24       To the extent they claim to seek relief pursuant to

25  Section 1985(3) -- that is, at 42 U.S.C. 1985(3) -- which

SPA-21

E6kdhord
                          Decision

1    protects against conspiracies to violate civil rights, that

2    claim can't go forward.  That Section requires "some racial, or

3    perhaps otherwise class based, invidiously discriminatory

4    animus behind the conspirators' action," which that is not an

5    allegation here.  Reynolds v. Barrett, 685 F.3d 193, 2001-02

6    (2d Cir. 2012).

7            The complaint can also be read to assert a 1983 claim.

8    But as Politopoulos points out, plaintiffs have not indicated

9    which constitutional right they believe was violated as a

10   result of the alleged cover-up.  To the extent they allege a

11   constitutional right to the Yonkers Police Department's

12   disclosure of the details of the shooting, there is no such

13   right.  Certainly absent of the discovery requested, there is

14   no such right.  See Williams v. City of Boston, 784 F.2d 430,

15   435 (1st Cir. 1986); Wilson v. Meeks, 52 F.3d 1547, 1557 (10th

16   Cir. 1995), abrogated on other grounds in Jiron v. City of

17   Lakewood, 392 F.3d 410, 415 (10th Cir. 2004).  Nor can

18   plaintiffs assert a constitutional right to a satisfactory

19   police investigation of Horn's death.  See Harrington v. County

20   of Suffolk, 607 F.3d 31, 32 (2d Cir. 2010); and Stevens v.

21   Webb, 2014 WL 1154246, at *4-6 (March 21, 2014) (concluding

22   that state statute requiring immediate investigation into

23   traffic deaths did not convey a constitutionally protected

24   interest to accident victims).

25           The only possible claim that I could come up with to

SPA-22

E6kdhord
                              Decision

1    plaintiffs that the Court can conceive based on anything is an

2    alleged right of access to the courts.  Again, I think the

3    courts have been very generous here in this interpretation,

4    because the plaintiffs have not specifically invoked the right.

5    But the right of access to the court has provided grounds for

6    relief in other Section 1983 cases involving cover-ups by the

7    police.  See Small v. City of New York, 274 F.Supp.2d 271,

8    278-280 (E.D.N.Y. 2003).  I will therefore go on to assess

9    whether plaintiffs have produced any evidence to support any

10   claim that there was a violation of Plaintiffs' right of access

11   to the courts by Politopoulos participating in a cover-up of

12   his alleged involvement.

13            All right.  Let's look at that standard.

14            2.  Legal Standard Governing Claims for Denial of

15   Access to the Courts.

16            Such a claim generally falls into two categories:

17   forward-looking and backward-looking.  See Christopher v.

18   Harbury, 536 U.S. 403, 414 and n. 11, 415 (2002).  In

19   forward-looking claims, "systematic official action frustrates

20   a plaintiff...in preparing and filing suits at the present

21   time."  That's Christopher at 413.  Plaintiffs here have

22   challenged filing fees that prevent an impoverished plaintiff

23   from bringing suit for prisoner's lack of access to a law

24   library.  Not in this suit but in the suits dealing with right

25   of access to the courts.  They are challenging such things as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-23

E6kdhord
                           Decision

1    the filing fees in lack of access to a law library.

2         It makes more sense in those cases.  The goal of those

3    suits is to place the plaintiff in a position to pursue a

4    separate claim for relief once the frustrating condition --

5    that is, the filing fees for bringing suit for lack of access

6    to a law library -- has been removed.  See Christopher v.

7    Harbury at 413.  Those are forward-looking suits.

8         Now, backward-looking suits, in contrast, "cover

9    claims not in aid of a class of suits yet to be litigated, but

10   of specific cases that cannot now be tried (or tried with all

11   material evidence) no matter what official action may be in the

12   future."  Christopher, 536 U.S. at 413-14.  The objects of

13   these backward-looking suits is "not the judgment in a further

14   lawsuit, but simply the judgment in the access claim itself."

15   Christopher at 414.  Backward-looking denial of access claims

16   have frequently involved allegations of police cover-ups.  See

17   Christopher and see Broudy v. Mather, 460 F.3d 106, (D.C.

18   Circuit 2006).

19        The Second Circuit has recently noted that "the

20   viability of backward-looking right of access claims is far

21   from clear in this Circuit."  Sousa v. Marquez, 702 F.3d 124,

22   128 (2d Cir. 2012).  Even if those claims are available, they

23   would cover situations in which "governmental action caused the

24   plaintiff's suit to be dismissed as untimely," or when

25   "official action was so severe as to render hollow his right to

SPA-24

E6kdhord
                         Decision

1    redress."  That's Sousa at 128.  "In general, a backward-

2    looking claim must be predicated upon 'deliberate action to

3    destroy evidence' or 'prevent plaintiff from obtaining

4    evidence.'"  Stevens, 2014 WL 1154246 at *7 (quoting Farella v.

5    City of New York, 2007 WL 2456886 at *8 (S.D.N.Y. August 23,

6    2007).  In addition, backward-looking claims require that the

7    judicial remedy was "completely foreclosed by the false

8    statement or nondisclosure."  Sousa, 702 F.3d at 128 (quoting

9    Broudy, 460 F.3d at 120).

10         3.  Plaintiffs Have Not Presented Sufficient Evidence

11    to Support a Backward-Looking Denial of Access to the Courts

12    Claim.

13         Plaintiffs here don't seek to eliminate conduct that's

14    preventing them from filing suit.  At the present time, indeed

15    they have filed a suit.  So if their claim -- again, which I

16    really am being very liberal in construing this claim -- cannot

17    be characterized as forward-looking, they seek to recover

18    damages for covering up murder.  They are saying the cover-up

19    prevented them from filing suit before the statute of

20    limitations expired.  So I'm going to assume that they are

21    asserting a backward-looking denial of access to the courts.

22         However, they haven't come forward with any evidence

23    to create a genuine factual issue to be tried of any such

24    claim.  They assert, without any evidence, that Politopoulos

25    and other people who are not identified conspired to conceal

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

SPA-25

E6kdhord
                         Decision

1   his involvement in Horn's death.  These assertions hinge on the

2   same facts that I found insufficient in the context of

3   plaintiffs' request for equitable estoppel.  Plaintiffs can't

4   claim that their discovery of the ballistics report just prior

5   to the expiration of the statute of limitations denied them

6   access to the courts, because Politopoulos had no duty to

7   disclose that report earlier in the absence of any request.

8   See Singh, 445 F. App'x at 378; Whalen v. County of Fulton, 126

9   F.3d 400, 408 (2d Cir. 1997); Ross, 8 N.Y.3d at 491-92.  The

10  plaintiffs haven't presented any facts that would suggest that

11  Politopoulos deliberately destroyed evidence, that he made

12  false statements to plaintiffs, that he refused to respond to

13  requests for information, or that he otherwise took any step to

14  prevent plaintiffs from obtaining the evidence relevant to

15  their claims.  See Sousa, 702 F.3d at 128; Stevens, 2014 WL

16  1154246 at *8; Farella, 2007 WL 2456886 at *8.  In short,

17  plaintiffs simply have not pointed to any fact whatsoever that

18  shows that Politopoulos took any action whatsoever that denied

19  plaintiffs access to the courts.  See Farella, 2007 WL 2456886

20  at *7.  They have failed to meet their burden to come forward

21  with material evidence on the essential elements of their claim

22  for relief.

23          III.  CONCLUSION

24              I have found that there is no issue of material fact

25  in dispute and each of plaintiffs' claims under Section 1983

SPA-26

E6kdhord
                        Decision

 1   fails as a matter of law.  I am granting the motion in its

 2   entirety.  The Clerk of Court is directed to enter judgment in

 3   favor of defendant and dismiss the case.

 4          All right, gentlemen.  That is my decision granting

 5   the motion for summary judgment.  I will enter an order that

 6   states "For the reasons set forth on the record today,

 7   defendants' motion for summary judgment is granted in its

 8   entirety, and the Clerk of Court is directed to enter judgment

 9   dismissing this case."

10          All right.  Thank you very much.  I appreciate your

11   coming in.

12          MR. THOMAS:  Just a housekeeping matter or two, your

13   Honor.

14          THE COURT:  Yes, sir.

15          MR. THOMAS:  I am sorry to report that we've only

16   recently been informed that plaintiff has died.

17          THE COURT:  That Chester Horn has died?

18          MR. THOMAS:  Correct, your Honor.

19          THE COURT:  When were you so informed?

20          MR. THOMAS:  We were so informed approximately a month

21   ago by a family member --

22          THE COURT:  The federal rules give you a certain

23   amount of time --

24          MR. THOMAS:  That's correct.

25          THE COURT:  The federal rules give you a certain

Case 14-2640, Document 40, 11/05/2014, 1363280, Page 51 of 55

E6kdhord

1     amount of time in which to substitute somebody.

2           MR. THOMAS:  Right.  I just want to bring the Court up

3     to date on that aspect of things.

4           We have undertaken -- we are in the process and have

5     been actively engaged in the last several weeks in securing a

6     substitute administrator for Mr. Horn's estate.  It will be

7     Diana Horn, who, of course, is also named as a plaintiff.  She

8     is a daughter of the decedent.  Obviously, that will have

9     bearing on the other action in which, unless I am mistaken,

10    your Honor has not yet rendered a decision.

11          THE COURT:  That is correct.

12          MR. THOMAS:  But it will likely have some procedural

13    bearing on this action as well going forward.

14          THE COURT:  I take it what you intend to do is -- I

15    don't know the exact procedure, but you can make a motion to

16    substitute somebody in the place of the decedent.

17          MR. THOMAS:  Correct.  And we did vis-a-vis defendant

18    O'Brien in the other action after he died.  So we will, in all

19    likelihood, be making a motion in this action to your Honor

20    shortly to substitute.  I don't think we need to await actual

21    receipt of letters of administration from the Westchester

22    County Surrogate.

23          THE COURT:  That I don't know.

24          MR. THOMAS:  I think we can do it just insofar as we

25    have filed a petition to have her appointed, and I believe that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-28

E6kdhord

1    lets us go forward with that motion in front of your Honor.

2         So I am just advising the Court we will be making that

3    motion I would anticipate within the next month.

4         THE COURT:  Well, it is a relatively short time

5    period.

6         MR. THOMAS:  I think it is 90 days from notification

7    of -- from the so-called suggestion of death.

8         THE COURT:  All right.  Fine.

9         MR. THOMAS:  Which we're effectively making at this

10    moment.

11         THE COURT:  All I can tell you is file your motion

12    pursuant to the Federal Rules of Civil Procedure.

13         MR. THOMAS:  OK.

14         THE COURT:  I doubt there will be any issue.

15         MR. THOMAS:  OK.  So I am just advising the Court of

16    that.  And as I say, we'll have some -- we will presumably have

17    to make it in the other action as well since the two, I don't

18    think, have been formally joined.

19         THE COURT:  Yes.  Rule 25(a)--

20         MR. THOMAS:  Right.

21         THE COURT:  "If a party dies and the claim is not

22    extinguished, the Court may order substitution of a proper

23    party.  Motion for substitution may be made by any party or by

24    the decedent's successor representative.  If the motion is not

25    made within 90 days after service of statement noting the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-29

E6kdhord

1    death, the action by or against the decedent must be

2    dismissed."

3              All right.  Well, then, make sure that you make the

4    motion right within 90 days after service of a statement noting

5    the death of.

6              And I take it you are now making that statement noting

7    the death?

8              MR. THOMAS:  Yes.  I think this is a de facto, what

9    they call, suggestion of death.

10             THE COURT:  All right.

11             MR. THOMAS:  And --

12             THE COURT:  Both actions?

13             MR. THOMAS:  Yes, your Honor.

14             THE COURT:  Fine.

15             MR. THOMAS:  We will have that done shortly.

16             THE COURT:  Thank you very much.

17             MR. THOMAS:  Thank you.

18             THE COURT:  All right.

19

20                               -   -   -

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SPA-30**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/20/14
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHESTER HORN, Individually, and as
Administrator of the ESTATE OF DAVID
HORN, GLADYS HORN, DAVID HORN,
JR., DIANA HORN and PATRICIA HORN,

                         Plaintiffs,

        -against-

CITY OF YONKERS POLICE OFFICER
DEAN POLITOPOULOS,

                     Defendant.

---

11-Cv-1482 (SHS)

ORDER

SIDNEY H. STEIN, U.S. District Judge.

      A pretrial conference having been held today, with counsel
for all parties present,

      IT IS HEREBY ORDERED that:

      1. For the reasons set forth on the record, defendant's
motion for summary judgment (Dkt. No. 10) is granted in its entirety.

      2. The Clerk of Court is directed to enter judgment in
defendant's favor and close this action.

Dated:  New York, New York
        June 20, 2014

                            SO ORDERED:

                            Sidney H. Stein, U.S.D.J.

SPA-31

```
USDC SDNY

DOCUMENT

ELECTRONICALLY FILED   6/23/2014
```

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
CHESTER HORN, Individually, and as
Administrator of the ESTATE OF DAVID HORN,
GLADYS HORN, DAVID HORN, JR., DIANA
HORN and PATRICIA HORN,

                        Plaintiffs,

          -against-

CITY OF YONKERS POLICE OFFICER
DEAN POLITOPOULOS,

                    Defendants.

-----------------------------------------------------------X

11 **CIVIL** 1482(SHS)

## JUDGMENT

      Defendant's having moved for summary judgment pursuant to Fed. R. Civ. P. 56, and the

matter having come before the Honorable Sidney H. Stein, United States District Judge, and the

Court, on June 20, 2014, having rendered its Order (Doc. 22) granting Defendant's motion for

summary judgment in its entirety, directing the clerk of court to enter judgment, it is,

      **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Order dated June 20, 2014, Defendant's motion for summary judgment is granted in its

entirety; accordingly, the case is closed.

**Dated:** New York, New York
        June 23, 2014

                                **RUBY J. KRAJICK**

                                **Clerk of Court**

          **BY:**          _Jennifer Notice_

                                **Deputy Clerk**